WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SUR-
ROGATE.—December, 1882.

### ARTHUR v. NELSON.[*]

*In the matter of the judicial settlement of the account of*
THOMAS NELSON, *and others, as executors of and trus-
tees under the will of* WILLIAM NELSON, *deceased.*

*Cestuis que trust* are so subordinated to, and dependent on their trustee that
they should not be held bound by any act of his to which they have as-
sented, except upon the clearest evidence that such assent was based
upon a full knowledge of all the facts and circumstances.

Testator, who died in 1869, by his will, gave seven eighths of the residue of
his estate, which consisted mainly of stocks, bonds and mortgages, as
follows: four equal eighth parts thereof to the executors, in trust, each
one of said eighths for the benefit, for life, of one of four daughters,
the income to be applied by the executors, with power of appointment
to each daughter, and in default thereof, with remainder over. Each
of the three remaining equal one eighth parts was also given in trust
for beneficiaries named. The executors and trustees were directed to
deduct from each share debts owing from the beneficiary to the testa-
tor. On January 1st, 1872, the executors set apart *existing securities*, as
nearly as practicable in equal amounts, for the several beneficiaries,
and kept an account with each, based on the securities so set apart.
The incomes and expenses of management of the several shares were
unequal. On the executors' accounting, a controversy having arisen
concerning the assignment of securities for the daughters' shares, *Held*,

1. That no such assignment was proper, the same not having been clearly
directed by the will, but, on the contrary, being against its provisions
looking toward equality in the beneficiaries' incomes.

2. That the daughters were not estopped by receipts signed by them, speci-
fying the interest as having been received on certain securities set apart
for them, respectively, because, though they were competent to con-
clude themselves, it did not appear that they possessed adequate knowl-
edge of all the facts, and at any rate, they could not affect the rights of
the remaindermen.

Testator, who died in 1869, by his will, appointed three persons executors
and trustees, and provided that "said executors and trustees be entitled

---

[*] See Hill v. Nelson, *post*, 357.

only to commissions at and after the following rates, to wit: at the rate of five per cent. on the first five thousand dollars, and two per cent. on the residue, or all sums above and beyond said five thousand dollars, for receiving and paying out the same; such commissions to be charged but once by all the executors and trustees, and not by each, and to be apportioned among them according to the amount of services rendered by each; and their necessary and legal actual expenses to be allowed in addition." Two of the executors filed, on February 23d, 1881, with the Surrogate, written renunciations of this provision, and elected to take the statutory compensation. It appeared that all the facts necessary to determine their choice were known to the executors as early as January, 1872.—

*Held*, that, though the statute allowing executors to elect between the statutory commissions and a testamentary provision in lieu thereof (2 R. S., 93, § 59; Code Civ. Pro., § 2737) fixes no time for the election, the executors were bound, if they desired to renounce the latter, to do so as soon as they ascertained which rate would be more advantageous, and that they had lost their opportunity by laches.

THE testator died in 1869, leaving a last will and testament, in and by which he gave the residue of his estate, after the payment of his debts, some small legacies, etc., as follows: one equal eighth part thereof to his son Thomas; four equal eighth parts thereof to his executors, in trust, each one of the said eighths for the benefit, for life, of one of four daughters; the income, etc., to be received and applied by said executors, with power of appointment to each of said daughters, of her one eighth, and, in default thereof, then to their respective heirs and next of kin. Another one equal eighth part was given to said Thomas Nelson, one of the executors, in trust, etc., for the benefit of George P. Nelson, another of the executors, with certain special provisions in regard thereto. Another like one eighth to the executors, in trust for Robert D. Nelson; and the remaining one eighth was given to the executors, in trust, for the benefit of the children of his deceased son, William R. Nelson; with directions, however, for the deduction from each one's

eighth part, of the amount and interest which each might be owing to him at the time of his death. He also, by the 22d clause of his will, authorized his executors, in their discretion, under certain conditions, to surrender, on the request of any or either of his said children, the trust as to such as so requested, and to convey and deliver over the property held thereunder, accordingly. On the 1st of January, 1872, the executors set apart existing securities, as nearly as practicable in equal amounts, to produce income for the several beneficiaries, and kept an account with each one, based on the securities so set apart, down to the time of the commencement of this accounting, from which it appeared that the income of each varied in amount, and that the expenses incident to the management of the various shares were unequal.

The testator appointed three persons executors and trustees, and provided "that said executors and trustees be entitled only to commissions at and after the following rates, to wit: at the rate of five per cent. on the first five thousand dollars, and two per cent. on the residue, or all sums above and beyond said five thousand dollars, for receiving and paying out the same; such commissions to be charged but once by all the executors and trustees, and not by each, and to be apportioned among them according to the amount of services rendered by each; and their necessary and legal actual expenses to be allowed in addition." Two of the executors, pending this proceeding, filed with the Surrogate renunciations of the provision as to commissions.

Dorinda H. Arthur, one of the four daughters, had died leaving a will, in which she designated the persons to

whom her one eighth should be paid, on behalf of whom this proceeding was instituted.

The trust as to the son, George P. Nelson, had been surrendered, and his share conveyed and delivered to him under the provisions of the 22d clause of the will; and Thomas Nelson had received his share, and had had the chief management of the estate.

THOMAS NELSON, *executor, in person.*

URIAH HILL, *executor, in person.*

JAMES P. LOWREY, *for Arthur legatees.*

STEPHEN LENT, *for Mrs. Nelson, Mrs. Ferris and Mrs. Johnson, legatees,* etc.

WM. M. BARTON, *special guardian for infants.*

THE SURROGATE.—The testator died, leaving a very large estate, real and personal; the latter amounting to upwards of $400,000, consisting mainly of stocks, bonds and mortgages, and debts due to him from his children. Of the real estate much has been sold, and much remains unsold.   In consequence of the great lapse of time since his death, during which no account has been rendered, the large amount of the estate, and the number of beneficiaries with whom accounts were kept, great difficulty has been experienced in reaching a satisfactory result.

In construing some of the provisions of the will, it should be borne in mind that the testator was an eminent lawyer, pains-taking, and very exact and careful in the use of appropriate language to express his meaning. This is quite apparent from the will itself.   Yet grave doubts have arisen as to the proper construction of some parts

of that elaborate instrument, which an effort is now made to solve, as well as some other questions which have arisen.

But, first, it is proposed to ascertain the share to which each is entitled, absolutely or to the use, as provided in the will. It appears, then, that seven of the children, on Nov. 1st, 1869, shortly after the testator's death, were indebted to him, for principal and interest, severally, as follows:

| | |
|---|---:|
| George P. Nelson | $7,435 39 |
| Thomas Nelson | 9,107 79 |
| Cornelia M. Nelson | 1,513 77 |
| E. N. Johnson | 3,061 97 |
| S. A. Ferris | 13,381 81 |
| R. D. Nelson | 17,522 80 |
| D. H. Arthur | 15,009 37 |
| | $67,032 90 |

I understand these to be the amounts of advances to each of the children, including interest to Nov. 1st, 1869, as stated, and, by the provisions of the will, they are debts due the estate. They are, therefore, to be included in the amount of assets, which, after paying or providing for legacies to others than the children, constitute the residuum, of which Thomas Nelson is entitled to one eighth absolutely, and of which each of the others, counting the children of William Rufus as one, is entitled to the use of one eighth for life, after deducting the above charges against each. We must first ascertain the net amount of the residuary estate, in order to fix the amount of principal of each share which is to produce income for each, so far as practicable. Therefore, the executors must be charged with the amount of the inventory, in-

cluding advances to children, interest thereon, and in-crease other than income, and, as such amount seems ascertainable on January 1st, 1872, I state the summary as of that date [the summary is here stated].

The executors are thus charged with the advances to each, and interest thereon to January 1st, 1872, and then are credited with the same as against each one's share, thus fixing the amount from which each is to derive income, if the figures are correct.

No assignment of securities or property, as constituting each daughter's share to produce income, concerning which a controversy has arisen, can be recognized as proper. The will does not direct it, as in the case of Bundy v. Bundy (*38 N. Y., 410*), cited by the executors, nor can it be sustained by any valid reason. On the contrary, great injustice might result. Some of the securities, thus assigned for the benefit of one legatee, might become greatly depreciated in value, or worthless; so that that legatee, instead of receiving income on one eighth of the whole estate, might, in fact, receive it only on the half of it, and, perhaps, on none; while another, in consequence of appreciation in value and fortunate management of those assigned for her benefit, might receive an income equal to that on one sixth or even on one quarter. By a total loss of securities so assigned for any one, which is possible, that one would be deprived of all income whatever. Such, certainly, was not the intention of the testator. He provides in his will for his four daughters thus: "four equal eighth parts," subject to certain deductions, he gives to his executors, in trust, to receive the rents, issues and profits of "said several eighth parts," and apply the rents, etc., of one eighth to the support, etc., of

each daughter. The word "several," used by the testator, has reference only to the "four equal eighth parts" before mentioned. Now, if, as has been suggested, a large portion of the securities, which were set apart to produce the income of any one of them, failed to produce any, while those set apart for the benefit of another, yielded an income at usual rates, we could not say that each had an income on one eighth of the fund. His intention clearly was to make them equal; but by the assignment of securities to create separate funds to produce the income of each, that equality, for obvious reasons, must almost inevitably be lost. The case of Holden v. N. Y. & E. Bank (72 N. Y., 286), cited by the executors, does not seem to me hostile to this view, but rather sustains it. There, the will gave to each of the testator's three children, the interest upon $20,000, during life, and authorized the executors to set apart and invest the necessary funds. It was a fund of $60,000, to be held in trust for the benefit of others. Here, it is four eighths of the residuum. FOLGER, J., in that case, says: "It is true, that it was not determined which particular securities were held for the benefit of each *cestui que trust*, and had there been a loss of any of them, questions might have arisen among them as to where the loss should fall." Such questions have arisen in this case, and are now under consideration. Here, seven eighths of the residuum were so to be held in trust, with no directions to divide into separate parts; and I do not think the executors had the power to set apart to each one, arbitrarily, the existing securities of the estate, without the clearest instructions in the will, to that effect. I fail to find any such. Of course, had the testator plainly directed it, it must have been done, how-

ever unequally it might have affected the life-tenants, and however disastrous it might have proved to the remaindermen.

But it is claimed that these ladies sanctioned the severing and setting apart of the securities, and, to establish the fact, receipts signed by them, specifying the interest as having been received on certain securities set apart for her, or their, benefit, are produced. It would, therefore, seem they had some knowledge of the fact, but I think it insufficient to estop them from claiming that each is entitled to one eighth of the net income. Had they possessed a full and accurate knowledge of all the facts, the relative value of the securities, etc., which it is not shown they did, they were, doubtless, competent to conclude themselves; but even then, the legatees and devisees in remainder would not have been affected in their interests. *Cestuis que trust* are so subordinated to and dependent upon their trustee, that they should not be held bound by any act of his, to which they have assented, except upon the clearest evidence that such assent was based upon a full knowledge of all the facts and circumstances. I must, therefore, hold that the executors are chargeable with the whole amount of the income of the four eighths, except interest on advances to children to January 1st, 1872, already disposed of, from which must be deducted the whole expense of the management, incidental thereto, and the balance must be divided among those entitled, in proportion to their respective shares producing income, as fixed above, subject, of course, to fluctuations in the amounts caused by losses, and by accretions from real estate sold and otherwise; such losses, if any, and increase to be borne and shared equally by the four beneficiaries.

Payments on account will be deducted. If the accounting is to be final as to all, as I understand it to be, like principles, so far as applicable, will govern in adjusting the account as to the others, except as to the share of George P. Nelson. Thomas Nelson was made sole trustee of his share, while those of the others were confided to the·care of the three executors, and although the testator does not, in terms, direct its severance from the bulk of the estate, the provision could not have been properly executed otherwise. No such intention is manifested as to the other shares. Doubtless, the division into eighths was intended to avoid the statute against perpetuities.

It is claimed that the executors have lost to the estate about $7,000 in managing the homestead farm of the deceased, and should be held liable therefor. The will gave them authority to manage; but the question as to whether they ought not to have ceased when they found they were losing money thereby, I do not deem it necessary to consider; as it appears they were authorized to, by the will, and did, lay out and grade streets on and over the same, in doing which a portion of this sum of $7,000 was expended—precisely how much does not appear. If either of the parties desire to introduce further evidence on the subject, an opportunity will be afforded; otherwise I am disposed to allow the executors the credit claimed by them.

It is also claimed by the contestants that the executors should be charged with interest on balances in their hands and mingled with their own funds, to the amount of upwards of $9,000. I do not think this claim can, under the circumstances, be sustained. The accounts are

in some confusion on the subject, and the contestants have been unable to establish facts and figures in regard thereto, on which to found a reasonable basis of calculation; besides, some alleged balances were in the hands of agents awaiting investment, and still others were due beneficiaries, awaiting opportunities for payment.

The only remaining question, to be considered, is that relating to commissions. The will fixes the rate of five per cent. on the first $5,000, and two per cent. on all beyond that sum, for receiving and paying out, to be charged but once, by all the executors, and not by each, and to be apportioned according to the services rendered by each. The statute provides that "where any provisions shall be made by any will, for specific compensation to an executor, the same shall be deemed a full satisfaction for his services in lieu of the allowance aforesaid" (the statutory commissions) "or his share thereof; unless such executor shall, by a written instrument, to be filed with the surrogate, renounce all claim to such specific legacy" (2 R. S., 93, § 59). This, undoubtedly, confers upon the executors the privilege of electing to take the compensation provided by the statute, or that provided by the will. Election, in law, is when a man is left to his own free will to take or do one thing or another, which he pleases (Jacob's Law Dic., title "Election"). Two of the executors filed on February 23d, 1881, with the Surrogate, written renunciations of the provisions of the will in this respect, and elected to take the compensation provided by statute. That of George P. Nelson is dated in 1878, and that of Thomas in 1881. In view of the fact that the statute fixes no time within which the renunciation shall be made, it becomes necessary to determine

whether it can be done at any time, however remote from the period when they entered upon the discharge of their duties. Possibly, the legislature, in adopting this provision, had in view the other provision of the statute, by which executors were authorized, and might be compelled, to account, at the expiration of eighteen months after their appointment, and contemplated the making of the election at that time. However that may be, I think the rule laid down by STORY, in his work on *Eq. Juris.*, § 1098, is applicable in this instance. He says, "the general rule is that the party is not bound to make any election" (where no time to make it is fixed) "until all the circumstances are known, and the state and condition, and value of the funds are clearly ascertained, for until so known and ascertained, it is impossible for the party to make a discriminating and deliberate choice, such as ought to bind him in reason and justice" (see, also, Chitty on Cont., *742, note;* Firemans' Ins. Co. v. Lawrence, *14 Johns., 46*). It is quite apparent that these executors knew all the facts and circumstances, needful to be known by them, in order to determine which would be most to their advantage, as early as when the inventory was filed, in 1870, and, most certainly, when the alleged setting apart of securities took place, on January 1st, 1872. The inventory disclosed that the value of the assets exceeded $400,000, on which the statutory commissions to the three executors would exceed $12,000, while under the will they would be less than $9,000; and the disproportion became greater as the income enlarged the amount. It was as clear to them at the last named date as it could be at any subsequent period of their administration, that their statutory compensation would be much

greater than that provided by the will. As soon as they ascertained that fact, it was, as I think, their duty, if they so desired, to make their election (Storring v. Borran, *55 Barb., 595*). Having failed to do so then, they lost the opportunity, and are too late to make it on this proceeding. Had they rendered their account, as they should have done, at the expiration of eighteen months from the date of their letters testamentary, doubtless this question would not have arisen, and the whole matter of their accounting, now become very intricate, would have been comparatively simple. Of course, in computing the amount of commissions, the sum of the items specifically bequeathed, of bad debts uncollected, and the share conveyed and delivered to George P. Nelson, will be disregarded.

The item of $3,761.66, deducted from the share of Mrs. Arthur, being that portion of debt which the testator acknowledged himself liable to pay to Thomas Nelson as a creditor of her husband, and which he directed to be paid out of her share with interest, has been retained by him, and the executors must properly be credited therefor in the decree.

Thomas Nelson, the executor, having acted as his own counsel, is entitled to no costs (Estate of Valentine, *9 Abb., N. C., 313*), but may recover his expenses in the proceeding, of which the stenographer's fees form a part. Costs are allowed to contestants out of the fund, to be taxed. The decree should be prepared in accordance with above views, and will be settled on four days' notice.